# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN DOE 1 and JOHN DOE 2,

      Plaintiffs,

                                    Case No. 2:20-cv-13287

v.

                                      Hon.

REV. MIROSLAW KROL, and the
ORCHARD LAKE SCHOOLS ("OLS")
a Michigan non-profit corp.,

      Defendants.

---

Jennifer B. Salvatore (P66640)
Nakisha Chaney (P65066)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
105 East Main Street
Northville, MI 48167
(T): (248) 679-8711
salvatore@sppplaw.com
chaney@sppplaw.com

Ward Powers (P33739)
Jonnie Powers (P78823)
LAW OFFICES OF WARD M. POWERS
302 W. Main Street
Northville, MI 48167
(T): (248) 347-1700
wpowers@powerslawoffices.com

*Attorneys for Plaintiffs*

---

# COMPLAINT AND JURY DEMAND

Plaintiffs, John Doe 1 and John Doe 2, through their attorneys, SALVATORE

PRESCOTT PORTER & PORTER, PLLC and THE LAW OFFICES OF WARD M. POWERS, PC, complain against Defendants REV. MIROSLAW KROL ("Krol"), and THE ORCHARD LAKE SCHOOLS ("OLS"), a Michigan non-profit corporation, as follows:

## INTRODUCTION

1.      This is a case of sexual abuse and retaliation within the Catholic Church. It does not involve crimes from decades past, but recent and on-going misconduct by the current CEO and Chancellor of Orchard Lake Schools, Father Miroslaw Krol – who oversees a seminary, Orchard Lake St. Mary's High School, and a Polish cultural center.  Krol's misconduct involves a long-standing pattern of behavior that the OLS Board of Regents has had ample warning about for years.

2.      Indeed, when Krol recruited Plaintiffs to move to Michigan to work for OLS, he was repeating a grooming tactic he had used before. After the Plaintiffs arrived at OLS, they both soon realized that Krol had recruited them not because of their potential to serve OLS, but for their potential to serve Krol sexually. While working under the supervision of Krol, each of the Plaintiffs experienced egregious sexual harassment—including sexual assaults. Each Plaintiff has in turn suffered professional repercussions and retaliation as a result of his refusal to submit to and reporting of Krol's unwanted sexual advances.

3.      As detailed in this Complaint, Defendant Krol has a history of

boundary-crossing behavior, often making inappropriate and unwanted sexual advances towards younger men who he had recruited to OLS to serve as priests, seminarians or employees.

4.     When his victims, including Plaintiffs, would reject Fr. Krol's sexual advances, he became irate and retaliatory – flooding their cell phones with angry and abusive calls and text messages, threatening to demote them or otherwise harm their careers and reputations, and speaking ill of them to anyone who would listen.

5.     The harassment, assault, abuse, threats and retaliation detailed in this Complaint is only the latest chapter in a long history of abuse perpetrated by Krol on the men around him.  And though many have warned OLS leadership and tried to bring his misconduct to light, Krol has manipulated those in power and lied about his conduct—at the cost of his victims' careers, reputations, emotional and spiritual health.

6.     The OLS Board of Regents for its part has abdicated its duty to appropriately investigate allegations of misconduct against Krol, properly supervise his conduct, or otherwise stop his abusive behavior.

## PARTIES

7.     **Plaintiff John Doe 1** is a young priest and resident of New Jersey. He attended seminary at SS. Cyril and Methodius Polish-American Seminary in Krakow, Poland before coming to OLS to continue his studies. John Doe 1 was

3

ordained a priest in 2015 and served as a priest in New Jersey until June of 2018, when Fr. Krol recruited him to become Vice Chancellor of Orchard Lake Schools. He served in that role until Fr. Krol's behavior caused him to resign and return to New Jersey in October of 2019.

8. **Plaintiff John Doe 2** is a resident of Illinois. An accomplished artist and cultural management executive, John Doe 2 moved from Chicago to begin working for the Polish Mission—one of three sub-entities of Defendant Orchard Lake Schools—in April of 2018. Married for sixteen years and a father, John Doe 2 was recruited and hand-picked by Fr. Krol to serve as the Director of the Polish Mission. He was terminated from his position in January of 2020 after reporting Krol's sexually harassing and abusive conduct to the OLS Board of Regents.

9. **Defendant Orchard Lake Schools** is a Catholic religious organization comprised of three entities: St. Mary's Preparatory High School, SS. Cyril and Methodius Seminary, and the Polish Mission. Defendant OLS is a non-profit corporation, in good standing, organized and existing under the laws of the State of Michigan. It is located in Orchard Lake, Michigan within the Eastern District of Michigan.

10. **Defendant Miroslaw Krol** is a priest and the Chancellor and Chief Executive Officer of Orchard Lake Schools, where he has served in that role since 2017. Krol since 2017 has lived on campus at OLS and thus resides in the Eastern

District of Michigan.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

12.     Based on Defendant OLS's location and Defendant Krol's residence in this district, as well as the fact that the causes of action arise from conduct of the Defendants that took place in this district, personal jurisdiction is proper in this Court.

13.     Venue is also proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(1) as it is the district in which Defendant OLS is located and where Defendant Krol resides, and under § 1391(b)(2) as it is the district in which a substantial part of the actionable events and omissions occurred.

## FACTUAL ALLEGATIONS

### A. Rampant Sexual Abuse in the Catholic Church Surrounds Krol as a Seminarian and Young Priest

14.     Although Fr. Krol began his seminarian studies at SS. Cyril and Methodius Seminary in Orchard Lake, he transferred to and completed his studies at the Immaculate Conception Seminary in New Jersey in the late 1990s. There, Krol studied under the recently-defrocked Cardinal Theodore McCarrick—who before leaving the church was the Archbishop of Newark and a Cardinal in Washington, D.C. As numerous media outlets have reported, McCarrick was credibly alleged to

have abused both children and adults over several decades, including engaging in rampant sexual harassment of seminarians at Immaculate Conception Seminary during the years in which Fr. Krol was his student.

15.    Since the allegations of sexual abuse publicly surfaced against McCarrick in 2018, his conduct has been the subject of multiple investigations and lawsuits, including the recently-released Vatican-commissioned *Report on the Holy See's Institutional Decision-Making Related to Former Cardinal McCarrick*. The allegations involving McCarrick include that he brought young men, including many seminarians, to a New Jersey beach house where he assigned sleeping arrangements in a manner that allowed him sexual access to his preferred victims.

16.    It is in this environment that Defendant Krol completed his religious training and spent much of his early years as a priest in Newark—where McCarrick was Archbishop. Indeed, Krol was ordained by McCarrick and, upon information and belief, witnessed in him many of the grooming tactics that Fr. Krol would later employ at OLS.

**B. Krol Has a History of Sexual Misconduct**

17.    Krol eventually returned to OLS and from 2006 to 2011 he served as a Dean and then as Vice Rector of the seminary. During this period, while he lived on campus at OLS, Krol also kept a room and attended parties at the Sweetest Heart of Mary Church rectory in Detroit. There, witnesses allege that Krol and others would

engage in sexual activity with seminarians. Rumors about sexual activity with seminarians and other sexual misconduct swirled around Krol during his time at OLS from 2006 to 2011.

18.    During this time, Krol also often traveled to Poland to recruit students to the seminary. Krol would often seek out and recruit students who had failed out of seminary in Poland or who had issues with alcohol or sexual matters. Upon information and belief, Krol would often manipulate and/or falsify records and documents regarding seminarians' academic and vocational qualifications. These students, some of whom had limited English-language proficiency, would arrive at OLS alone and eager to revive their dreams of becoming a priest. They were vulnerable and largely dependent on Krol.

19.    Upon information and belief, Krol made sexual advances towards some of these students and/or invited them to come with him to parties at the Sweetest Heart of Mary Church rectory. Other priests, too, would attend and/or knew about these parties, including an Auxiliary Bishop with the Archdiocese of Detroit who also was a Trustee of the OLS Seminary.

20.    At least one young seminarian recruited from Poland during this time period is reported to have confided in both a local priest and in a Bishop in New Jersey that the sexual activity involving Krol at these parties was not always consensual. Upon information and belief, the Bishop told the seminarian that if he

wanted to become a priest, he should not say anything further about the topic.

21.     During the time period that Krol was spending nights at the Sweetest Heart of Mary rectory, witnesses report that the pastor there brought a person who appeared to be a male sex worker from Poland to also stay at the rectory—claiming that person was a "cousin."  Eventually, the pastor at the Sweetest Heart of Mary Church was investigated by the Archdiocese and removed from the parish and Fr. Krol's visits there ended after a different young man—a former prisoner who was living with the pastor at the rectory—died at the rectory of a drug overdose.  Krol left OLS around 2011 and returned to his home diocese in New Jersey, where he worked as a parish priest for several years.

## C. The OLS Board is Warned of Krol's Misconduct, Yet He is Appointed Chancellor and Chief Executive Officer

22.     In or around 2017, Krol was being considered as a candidate for Chancellor and Chief Executive Officer of OLS.  But two priests who had worked with Krol at OLS in the past raised concerns with the OLS Board of Regents regarding Krol's behavior. Upon information and belief, those concerns included Krol's rumored sexual misconduct when he had served as a Dean and Vice Rector.

23.     Despite these warnings about Krol, the OLS Board of Regents appointed him as Chancellor and Chief Executive Officer in 2017.

24.     As Chancellor of OLS, Krol has power and influence in the Polish Catholic community. He also brings significant money into the OLS organization

and has deep ties to the Vatican by virtue of his friendship with Polish Cardinal Dziwisz, a former Secretary to Pope John Paul II.

25.   As a result of his influence, the OLS Board of Regents has had blinders on to Krol's on-going misconduct—blinders that have allowed Krol to use his position at OLS to recruit and then to sexually harass and abuse many young men around him.

26.   John Doe 1 and John Doe 2 were two of those men.

**D. Krol Uses his Position at OLS to Victimize His Subordinates**

27.   John Doe 1 was the first of the Plaintiffs to meet Krol. They met when John Doe 1 was a seminarian in Poland, where Krol would at times visit.

28.   John Doe 1 became re-acquainted with Krol several years later, when both were serving as priests in New Jersey in the 2015-2017 time period. At that time, Krol was a powerful priest in the Archdiocese of Newark, where he served in a large and prestigious Polish parish where he held events with bishops and cardinals from all over the world.

29.   Soon after he became Chancellor of OLS, Krol contacted John Doe 1 and asked him to come work with him as Vice Chancellor. John Doe 1 declined the offer.

30.   Krol continued to contact John Doe 1, calling him repeatedly and asking him to serve as OLS Vice Chancellor. John Doe 1 again declined these offers.

31.    Eventually, Krol told John Doe 1 that if he came to OLS, he would be able to continue his studies as a priest and OLS would pay for and help arrange for John Doe 1's green card.[1]  John Doe 1 finally agreed, moving to Michigan to serve as Vice Chancellor at OLS in or around June of 2018.

32.    At around that same time, John Doe 2 had also been hired to work as the Director of the Polish Mission at OLS. John Doe 2 had met Fr. Krol in connection with musical concerts that he had organized at the Church. Although a search committee had been convened to hire the Director, Fr. Krol personally recruited John Doe 2, urged him to apply, and then made clear to the search committee that John Doe 2 was his preferred candidate.

33.    As the Director of the Polish Mission, John Doe 2 worked under the direction of Krol.

34.    Early in John Doe 2's employment, in or around May of 2018, Krol invited John Doe 2 to his apartment for a drink. While there, Krol inappropriately and suggestively invited John Doe 2 to "lay down" with him and "relax" in Krol's bed.

35.    A married man and devout Catholic, John Doe 2 was shocked that a priest would proposition him in this way. He excused himself and left Krol's apartment for the evening.

_____

[1] In fact, Krol did not make good on his promise regarding John Doe 1's green card.

36.    But John Doe 2's rejection of this advance did not deter Krol, who continued to pursue John Doe 2. At first, John Doe 2 continued to politely decline Krol's repeated invitations to meet in his apartment. But then Krol sent John Doe 2 a text message in Polish that implied that if John Doe 2 did not come see Krol in his apartment that night, his job may be at risk.

37.    Fearful of losing his job, John Doe 2 went to Krol's apartment. While he was there, Krol lunged at John Doe 2, leaping into his lap. Krol forced himself onto John Doe 2 and began kissing his neck and lips and trying to put his hand down John Doe 2's pants.  Krol told John Doe 2 how much he wanted him and pled with him to have sex with him.

38.    John Doe 2 forcefully pushed Krol away and left the apartment.

39.    Shortly thereafter, John Doe 2 went on vacation to Poland with his family.  While there, he ignored Krol's repeated attempts to contact him.

40.    When John Doe 2 returned, however, Krol continued pursuing him. Stressed out and anxious about how to deal with the situation, John Doe 2 tried to find excuses not to be alone with Krol and planned many meetings so that he would be busy when Krol sought him out.

41.    Several months later, Krol again assaulted John Doe 2. He invited John Doe 2 to his apartment to discuss future plans for the Polish Mission. During the meeting, Krol had several drinks and at one point excused himself to go to the

bathroom. When he returned, Krol sat next to John Doe 2, put his hand on John Doe 2's leg, and began slowly moving it up his thigh.  At the same time, Krol reached his other hand into his own pants and began to masturbate.  Krol began asking John Doe 2 to have sex with him and telling John Doe 2 that he loved him.

42.    John Doe 2, as in the past, rejected Krol's advance by moving Krol's hand off his leg and leaving the apartment.

43.    The next morning, John Doe 2 received strange and threatening text messages and emails from Krol. Krol alternated between threatening John Doe 2 and claiming that he (Krol) was protecting John Doe 2's job security, saying things like "As long as I am here you are safe..."

44.    During this same time period (and unbeknownst to John Doe 2) Krol was also victimizing John Doe 1.

45.    As with John Doe 2, Fr. Krol was John Doe 1's direct supervisor. He controlled every aspect of John Doe 1's life, requiring him to be available at all times; forcing John Doe 1 to cancel plans or return early from vacation with his parents who were visiting from Poland; regularly berating John Doe 1 by telling him that his work was never good enough; and regularly insulting and yelling at him.

46.    John Doe 1, like John Doe 2, was also often invited to evening social gatherings in Krol's on-campus apartment, where Krol would drink to excess. John Doe 1, like John Doe 2, tried to avoid these situations, or to leave early. In particular,

he made sure never to be the last person there, because he was fearful of what Krol might do.

47.    One evening at one such gathering, both John Doe 1 and John Doe 2 were present. As they sat next to each other, John Doe 1 received a FaceTime call from a friend in New Jersey who Krol also knew. Under the pretense of wanting to appear in the FaceTime call, Krol lunged into John Doe 1's lap. While doing so, he shoved his hand down John Doe 1's pants and touched his penis. John Doe 1 — horrified—forcefully pushed Krol away.

48.    The next day, Krol commented to John Doe 1 on the interaction and on how much "fun" he had had the night before. He also commented to John Doe 1 on the size of his penis.  He continued to repeat words to that effect to John Doe 1 on other occasions after the assault.

49.    Krol continued to sexually harass John Doe 1 and John Doe 2 both verbally and physically in a similar manner over the next several months. Indeed, it was so common for Krol to make sexually suggestive comments and overtures towards John Doe 1 that he came to see it as an aspect of the job that he simply had to endure.

50.    Likewise, on two more occasions Krol again lured John Doe 2 to his apartment. On the first occasion, Krol tricked John Doe 2 into believing that he had had a heart attack or had been injured or fallen ill in some sort of emergency

situation.

51.    The second time, Krol repeatedly called John Doe 2's cell phone until John Doe 2 agreed to join Krol in his apartment. On both of these occasions, Krol assaulted John Doe 2 in his apartment, where, among other things, Krol kissed John Doe 2 against his will, touched John Doe 2's genitalia, and verbally propositioned him by saying things like "I want you" and "Come on, let's do it!" Each time, John Doe 2 rebuffed Krol's unwanted advances.

52.    In another instance in or around June of 2019, Fr. Krol called John Doe 1 and pressured him to drive him (Krol) and a visiting priest from Chicago to a bar. When John Doe 1 initially refused, Krol and the visiting priest (who had both already been drinking at the time) threatened to drive themselves. Fearful that Krol and the priest would kill themselves and/or someone else in a drunk driving accident, John Doe 1 —who was sober—reluctantly agreed to drive them. When they got to the bar, John Doe 1 realized that it was a gay bar. When they left, Fr. Krol directed John Doe 1 to another stop—which John Doe 1 soon realized was a motel.

53.    At the motel, a male sex worker, who Krol had apparently contacted through the internet, was waiting. It was apparent to John Doe 1 that the sex worker knew Fr. Father Krol. John Doe 1 remained in the car while the other priests went into the motel. At one point, the priests asked John Doe 1 to retrieve cash from an

ATM, which John Doe 1 concluded was used to pay the sex worker.

54.    When they arrived back to Krol's apartment that evening, John Doe 1 began to help Krol—who had fallen asleep in the back seat—out of the car. Krol threw his arms around John Doe 1's neck and tried to hug him. John Doe 1 resisted, but Krol insisted that he (Krol) wanted to hug John Doe 1—saying "I have to hug you because I am your friend, and I love you very much." Krol continued attempting to hug John Doe 1 and then started kissing him on the face and lips, trying to put his tongue in John Doe 1's mouth. John Doe 1 pushed Krol away and told him to go home.

55.    The experience of this evening was deeply traumatizing for John Doe 1. But because of Krol's emotionally abusive and manipulative behavior, John Doe 1 was afraid that if he angered Krol, Krol would retaliate by firing him or using his power in the church to tarnish John Doe 1's reputation—something John Doe 1 had seen Krol do to other young priests. He did not know where to turn for help.

56.    Unbeknownst to John Doe 1, in or around December 2018, John Doe 2 began disclosing the sexual harassment that he had endured from Krol to a Trustee of the Polish Mission. John Doe 2 also confided in several friends and family members, including a cousin who is a priest, about what was happening with Fr. Krol.

57.    Fearful of losing his job, John Doe 2 continued to avoid Krol as much

as possible. When he felt he could not continue to refuse Krol's constant invitations to come to his apartment, John Doe 2 would ask another employee to come with him so that he would not have to be alone with Krol.

58.    Like John Doe 2, John Doe 1 tried to avoid Krol, though it was difficult given the nature of his job. Ultimately, John Doe 1 reported to his bishop in New Jersey that it was awful to work for Krol and begged the bishop to remove him from OLS.

59.    The bishop told John Doe 1 that he must tell Krol that he wanted to leave. But John Doe 1 was fearful that Krol would try to prevent him from leaving. Ultimately, John Doe 1 decided to tell Krol that he had to leave for reasons related to his green card.

60.    John Doe 1 left OLS in October 2019. After he left, Krol spread false rumors that John Doe 1 was forced to leave OLS because he was gay. These statements were untrue and continue to harm John Doe 1 to this day.

61.    When John Doe 1 left OLS, Fr. Krol then recruited another young priest to campus to replace him, proceeding to engage in similar sexually harassing and abusive conduct with this priest.

62.    After this priest ("John Doe 3") also rejected Krol's sexual advances, Krol's treatment of him shifted considerably. He began criticizing John Doe 3, sending him torrents of abusive text messages, and blaming John Doe 3 for mistakes

that he had not made.

63.     At the same time, Krol's harassing and abusive behavior towards John Doe 2 continued.

**E. Multiple Reports Are Made About Krol to OLS**

64.     In August 2019, a member of the OLS Board of Regents who had been close to many seminarians and priests, resigned over Krol's conduct, including his sexual misconduct and verbal abuse towards seminarians. That Board member put her concerns about Fr. Krol in writing to the Board.

65.     This Board member also reached out to the Archdiocese of Detroit. She did so in an attempt to share information about Krol's misconduct with Archbishop Vigneron. The Board member was told essentially that Archbishop Vigneron was not interested in discussing these issues with her unless she had first-hand knowledge of the misconduct.

66.     In January 2020, John Doe 2 again reported Krol's sexual harassment – this time to John Roland, a member of the OLS Board of Regents and Vice Chairman of the Polish Mission's Board of Directors. The following day, Mr. Roland told John Doe 2 that he had to disclose the information to the entire Board of Regents, which John Doe 2 gave him permission to do.

67.     However, when Mr. Roland disclosed John Doe 2's allegations of sexual harassment, other Board members chastised him—suggesting that Mr.

Roland should have addressed this issue only with Krol. Shortly thereafter, Mr. Roland was removed from the OLS Board.

68.    Following John Doe 2's complaint to the Board, on January 15, 2020, Todd Covert, Chief Operating Officer of OLS, asked to speak with John Doe 2. In that conversation, John Doe 2 also disclosed to Mr. Covert the sexual abuse he had endured by Krol. Mr. Covert appeared sympathetic and told John Doe 2 that the Board would conduct a thorough investigation of his allegations.

69.    Two days later, however, and without any investigation, John Doe 2 was suddenly terminated from his position as Director of the Polish Mission. The OLS Board of Regents did not ask John Doe 2 any questions about Krol's conduct towards him and never even interviewed him about his allegations.  Instead, OLS Board Vice Chair and legal counsel Jeff Stewart simply sent a letter to John Doe 2 falsely accusing him of a variety of criminal and tortious conduct—conduct that was untrue, had never been raised with John Doe 2 previously, and was nowhere mentioned or documented in his personnel file.

70.    OLS's retaliation against John Doe 2 and complete failure to investigate his allegations was particularly egregious because John Doe 2 was not the first to report sexual misconduct by Fr. Krol to the Board.  Members of the Board of Regents had been warned about Krol's sexual misconduct both before and after he became Chancellor. In addition to the warnings from other priests about Krol in 2017, upon

information and belief, an anonymous letter had been sent to the Board of Regents in or around the 2018-2019 time period indicating that Krol had engaged in sexual abuse. And of course a Board member had resigned just a few months before John Doe's allegations were made. In her resignation letter she also made clear that she had concerns about Krol that included concerns about his sexual behavior.

71.     Despite the numerous and varied forms of notice about Krol, the Board of Regents not only failed in their legal obligation to investigate and to take action to protect priests, seminarians, or employees of OLS from Krol's predatory behavior, but they facilitated and allowed retaliation against Fr. Krol's victims.

72.     In light of the harassment and abuse that he experienced from Fr. Krol, John Doe 3 informed him in December of 2019 that he would leave OLS when his contract ended the following June.  In March of 2020, a few months after John Doe 2 was fired, Fr. Krol also terminated John Doe 3 rather than allow him to finish out his contract. Following his termination, John Doe 3 also reported Krol's sexual misconduct to church authorities by writing to the Archdiocese of Detroit in or around March of 2020.

73.     In mid-April 2020, a detective from the Michigan Attorney General's office contacted John Doe 3 and interviewed him about Krol's conduct. The detective also at that time reached out to John Doe 1 who, fearful of retaliation, did not disclose Fr. Krol's sexual abuse in that initial interview.  Several months later in

a subsequent interview, John Doe 1 fully disclosed to the detective the sexual abuse he had experienced from Krol.

74.     Despite John Doe 3's report to the Archdiocese and the multiple other complaints about Krol, no one from OLS ever contacted John Doe 3 to discuss his allegations or to conduct an investigation. Likewise, John Doe 3's report of sexual abuse by Krol – a report coming just two months after John Doe 2 made similar allegations to the OLS Board – still did not cause OLS to reach out to John Doe 2 or interview him.

75.     In August of 2020, Plaintiffs' legal counsel formally contacted the OLS Board of Regents to again report Krol's sexual harassment of employees and potentially others. The letter made clear that John Does 1-3 had all disclosed and reported Krol's sexual misconduct.   The following month—on September 25, 2020—Fr. Krol told a Polish radio personality, falsely, that John Doe 3 had been fired from OLS for mismanaging the OLS seminary and misappropriating seminary funds. He also falsely claimed that John Doe 2 had misappropriated funds from OLS. These false allegations were broadcast by this radio personality on his weekly radio show and heard by a wide audience of listeners in the Polish community.

76.     Krol also began retaliating against John Doe 1. Fr. Krol contacted John Doe 1's friends and family members, made threatening statements to John Doe 1, and began causing problems for John Doe 1 in his home diocese in New Jersey.

Indeed, shortly after Krol learned of John Doe 1's cooperation with legal counsel in this matter, parishioners in John Doe 1's diocese began receiving anonymous and disparaging letters about John Doe 1.

## COUNT I
## ASSAULT & BATTERY
### (by all Plaintiffs against Defendant Krol)

77.    Plaintiffs repeat and reallege each and every allegation in this Complaint as though fully set forth therein.

78.    Defendant Krol subjected John Doe 1 and John Doe 2 to a well-founded apprehension of unwanted imminent sexual contact, coupled with the apparent present ability to accomplish the contact.

79.    Although John Doe 2's employment with OLS is subject to an arbitration agreement, that agreement is void as against public policy insofar as it restricts his right to bring a public lawsuit based on sexual assaults that he experienced in his workplace and by his supervisor.[2]

80.    On multiple occasions throughout his employment, Defendant Krol subjected each of the Plaintiffs to willful and harmful or offensive touching as set forth above.

81.    The touching resulted from acts intended to cause such contact.

---

[2] John Doe 2 brings his non-sexual assault employment-related claims against Defendants in private arbitration, which is currently pending.

82.     Neither of the Plaintiffs consented to this willful, harmful, and offensive touching.

83.     To the extent that Defendant Krol alleges that any of the wrongdoing set forth in this Complaint was the result of consensual activity, this is untrue as such consent was not provided.

84.     As a direct and proximate result of Defendant Krol's actions, each of the Plaintiffs has sustained injuries and damages including, but not limited to, mental and emotional distress including anxiety, fear, stress, shock, mental anguish, self-blame, humiliation, embarrassment, loss of a sense of security, and the loss of the ordinary pleasures of everyday life.

<u>COUNT II</u>
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT –**
**HOSTILE WORK ENVIRONMENT**
**M.C.L. § 37.2701**
**(by all Plaintiffs against Defendants Krol and OLS)**

85.     Plaintiffs repeat and reallege each and every allegation in this Complaint as though fully set forth herein.

86.     From April 2018 until his termination in January 2020, John Doe 2 was an employee of OLS and was covered by and within the meaning of the Elliott-Larsen Civil Rights Act.

87.     Although John Doe 2's employment with OLS is subject to an arbitration agreement, that agreement is void as against public policy insofar as it

restricts his right to bring a public lawsuit based on sexual assaults that he experienced in his workplace and by his supervisor.

88. From June 2018 until his departure in October 2019, John Doe 1 was also an employee of OLS and was covered by and within the meaning of the Elliott-Larsen Civil Rights Act.

89. During the course of their employment with OLS, the Plaintiffs were subjected to unwelcome comments and conduct of an offensive and overtly sexual nature, up to and including, as set forth above, sexual assaults by Defendant Krol, resulting in the creation of a hostile work environment.

90. Krol's conduct towards Plaintiffs was on the basis of the Plaintiffs' sex and/or was sexual in nature.

91. Krol's conduct was severe and/or pervasive and constitutes sex harassment in violation of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2701 *et seq*.

92. Defendants knew or should have known of the existence of a hostile work environment. OLS's response to the unwanted sexual conduct, as outlined above, manifests indifference or unreasonableness in light of the facts the employer knew or should have known.

93. The actions of the Defendants and their agents were negligent or intentional and willful, in deliberate disregard of and with reckless indifference to

the rights and sensibilities of the Plaintiffs.

94.    As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiffs' employment were adversely affected.

95.    As a direct and proximate result of the Defendants' actions, Plaintiffs have sustained injuries and damages including, but not limited to, the loss of earnings and earning capacity; mental and emotional distress including anxiety and mental anguish; humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

**COUNT III**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT –**
**RETALIATION**
**M.C.L. § 37.2701**
**(by John Doe 1 against Defendant Krol)**

96.    Plaintiff repeats and realleges each and every allegation in this Complaint as though fully set forth herein.

97.    Plaintiff engaged in protected activity under M.C.L. § 37.2701(a) as set forth above when he reported the sexual harassment he had experienced by Defendant Krol to legal counsel and to the Michigan Attorney General's office.

98.    Defendant Krol knew about Plaintiff's protected activity.

99.    Defendant Krol took adverse action against John Doe 1 because of his protected activity, including, but not limited to, disparaging John Doe 1 to other priests and members of the Polish community, contacting John Doe 1's friends and

family and having anonymous letters sent to parishioners in John Doe 1's diocese, and by spreading a false rumor that John Doe 1 was removed from his position at OLS because he is gay.

100.  John Doe 1's protected conduct motivated Defendant Krol's retaliation.

101.  Krol's retaliation against John Doe 1 was intentional and/or was with reckless indifference to Plaintiffs' rights.

102.  John Doe 1 has suffered harm to his reputation, emotional distress, and other damages because of Defendant Krol's retaliation.

**COUNT IV**
**NEGLIGENT RETENTION AND SUPERVISION**
**(by John Doe 1 against Defendant OLS)**

103.  Plaintiff repeats and realleges each and every allegation in this Complaint as though fully set forth herein.

104.  At all times relevant hereto, Defendant OLS had certain duties to members of the general public and to the employees of OLS, including Plaintiffs. Those duties included the duty to act in a reasonable, cautious, prudent, and careful manner under the circumstances so as to avoid retaining persons in a position of authority whom they knew or reasonably should have known to be unfit or who could create or otherwise pose a risk of harm to others.

105.  Defendant OLS was aware of the serious allegations of sexual misconduct surrounding Defendant Krol, yet Defendant OLS refused to act on this

information, as more fully set forth above.

106.   This extensive knowledge created a heightened special duty on the part of Defendant OLS relative to the supervision and retention of Defendant Krol.

107.   Yet, Defendant OLS breached its duties by retaining Defendant Krol in a position of power and authority and failing to properly investigate or supervise his activities.

108.   As a direct and proximate result of Defendant OLS's breach of its duty, John Doe 1 has sustained injuries and damages including, but not limited to, emotional injuries stemming from sexual assaults; the loss of earnings and earning capacity, mental and emotional distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## COUNT V
## NEGLIGENT HIRING
### (by John Doe 1 against Defendant OLS)

109.   Plaintiff repeats and realleges each and every allegation in this Complaint as though fully set forth herein.

110.   At all times relevant hereto, Defendant OLS had certain duties to members of the general public and to the employees of OLS, including Plaintiffs. Those duties included the duty to act in a reasonable, cautious, prudent, and careful manner under the circumstances so as to avoid hiring persons into a position of

authority whom they knew or reasonably should have known to be unfit or who could create or otherwise pose a risk of harm to others.

111.   Defendant OLS had knowledge of allegations of sexually inappropriate behavior by Defendant Krol at the time OLS hired Krol as Chancellor in 2017, yet Defendant OLS refused to act on this information, as more fully set forth above.

112.   This extensive knowledge created a heightened duty on the part of Defendant OLS relevant to the hiring of Krol.

113.   Defendant breached its duties by failing to properly investigate and respond to known information about Krol's sexual misconduct prior to 2017.  Thus, the further misconduct perpetrated by Krol on John Doe 1 was predictable and foreseeable.

114.   As a direct and proximate result of Defendant OLS's breach of its duty, John Doe 1 has sustained injuries and damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## COUNT VI
### CIVIL SEX TRAFFICKING
### 18 U.S.C. §§ 1591, 1595
### (by John Doe 1 against Defendants Krol and OLS)

115.   Plaintiff repeats and realleges each and every allegation in this Complaint as though fully set forth herein.

116.   Defendant Krol induced John Doe 1 to come to Michigan through fraudulent promises that OLS would assist with and pay for John Doe 1's green card process. Defendant Krol knowingly made this false promise with the purpose of sexually exploiting John Doe 1.

117.   Defendant OLS knew or should have known that Defendant Krol intended to sexually exploit John Doe 1 when he recruited him and brought him across state lines to work for OLS.

118.   Defendant OLS benefitted from knowingly assisting, supporting, and facilitating Defendant Krol's sexual exploitation of John Doe 1 by continuing to employ Krol—who remains a respected priest and prolific fundraiser for OLS within the Polish and Catholic communities—as Chancellor and Chief Executive Officer of OLS, despite his conduct.

119.   By the acts and practices described herein, Defendants have subjected John Doe 1 to sexual exploitation in violation of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1595. More specifically, Defendants engaged in the recruitment and/or solicitation of John Doe 1 knowing or in reckless disregard of the fact that coercion or fraud would be used to cause him to engage in a commercial sex act (i.e. a sex act, on account of which something of value—i.e. a job—was given or received).

120.   Defendant Krol's actions knowingly affected interstate or foreign

commerce.

121.   As a direct and proximate result of the Defendants' actions, John Doe 1 has sustained injuries and damages including, but not limited to, the loss of earnings and earning capacity; mental and emotional distress including anxiety and mental anguish; humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(by John Doe 1 against Defendant Krol)**

122.   Plaintiff repeats and realleges each and every allegation in this Complaint as though fully set forth herein.

123.   Defendant Krol exhibits extreme and outrageous conduct as described above, including without limitation:

    a.    Constantly berating and insulting John Doe 1;

    b.    Commenting on the size of John Doe 1's penis;

    c.    Assaulting and attempting to sexually assault John Doe 1; and

    d.    Defaming John Doe 1 by making false statements about his work performance, professionalism and sexual orientation to others in their shared communities and by sending anonymous disparaging letters to parishioners in John Doe 1's diocese.

124.   Defendant Krol acted intentionally.

125.   Defendant Krol's conduct caused John Doe 1 severe emotional distress.

126.   As a direct and proximate result of the Defendant's actions, John Doe 1 has sustained injuries and damages including, but not limited to, the loss of earnings and earning capacity; mental and emotional distress including anxiety and mental anguish; humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## RELIEF REQUESTED

Plaintiffs seek all available relief and remedies requested herein, including but not limited to:

a.  compensatory damages;

b.  exemplary/punitive damages;

c.  attorneys' fees and costs; and

d.  all other relief, equitable and otherwise, allowed by law and deemed appropriate by the judge or jury.

Respectfully submitted,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
Nakisha Chaney (P65066)
105 E. Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
chaney@spplaw.com

Date: December 14, 2020

Ward Powers (P33739)
Jonnie Powers (P78823)
LAW OFFICES OF WARD M. POWERS
302 W. Main Street
Northville, MI 48167
(T): (248) 347-1700
wpowers@powerslawoffices.com

*Attorneys for Plaintiffs*

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiffs, JOHN DOE 1 and JOHN DOE 2, by and through their undersigned counsel, and hereby demand a trial by jury of all the issues in this case.

<table>
<tr><td></td><td>Respectfully submitted,<br>SALVATORE PRESCOTT<br>PORTER & PORTER, PLLC</td></tr>
<tr><td>Date: December 14, 2020</td><td>/s/ Jennifer B. Salvatore<br>Jennifer B. Salvatore (P66640)<br>Nakisha Chaney (P65066)<br>Attorneys for Plaintiffs<br>105 E. Main Street<br>Northville, MI 48167<br>(248) 679-8711<br>salvatore@sppplaw.com<br>chaney@sppplaw.com</td></tr>
<tr><td></td><td>Ward Powers (P33739)<br>Jonnie Powers (P78823)<br>LAW OFFICES OF WARD M. POWERS<br>302 W. Main Street<br>Northville, MI 48167<br>(T): (248) 347-1700<br>wpowers@powerslawoffices.com</td></tr>
<tr><td></td><td>*Attorneys for Plaintiffs*</td></tr>
</table>